UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

ANTONIO ONATE, JR., on behalf of himself
and all others similarly situated,                   :

                                                     :     1:20-cv-08292-AS-JW

                                    Plaintiff,       :

                                                     :

              -against-                              :

                                                     :

AHRC HEALTH CARE, INC.,                              :

                                                     :

                                    Defendant.

------------------------------------------------------------ x

**DEFENDANT'S MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION AND IN
SUPPORT OF CROSS MOTION TO STRIKE**

CLIFTON BUDD & DeMARIA, LLP
Attorneys for Defendant
AHRC Health Care, Inc
The Empire State Building
350 Fifth Avenue, 61st Floor
New York, New York 10118
(212) 687-7410

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... iii

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF FACTS .........................................................................................2

     I.      ABOUT AHRC NYC ................................................................................2

     II.     AHRC'S BROAD ORGANIZATIONAL STRUCTURE....................................3

     III.    ONATE'S SPECIFIC CLAIMS IN THIS ACTION .............................................6

     IV.    DIFFERING CLAIMS OF OTHER PUTATIVE CLASS
            MEMBERS ................................................................................................8

     V.     PROCESSES FOR ENSURING ACCURATE COUNT OF
            HOURS WORKED ....................................................................................9

     VI.    RELEVANT PROCEDURAL HISTORY ..........................................................10

ARGUMENT .............................................................................................................11

     I.      LEGAL STANDARD UNDER RULE 23 .........................................................11

     II.     PLAINTIFF CANNOT SATISFY THE REQUIREMENTS OF
            RULE 23(A)................................................................................................12

            A.     Existence of the meal break pay rules is not enough .................................14

            B.     Existence of the rounding pay rules not enough .......................................15

            C.     There is no centralized policy to deny payment for hours
                   worked.........................................................................................................17

     III.    PLAINTIFF CANNOT SATISFY THE REQUIREMENTS RULE
            23(B) ..........................................................................................................18

            A.     Plaintiff's fail-safe class definition is unworkable.....................................19

            B.     Onate's sweeping class definition necessarily means that
                   individualized questions will predominate over any
                   common questions .......................................................................................20

i

IV.      CROSS-MOTION TO STRIKE EVIDENCE OF SUBSEQUENT
           REMEDIAL MEASURES ............................................................................22

CONCLUSION...........................................................................................................................25

## TABLE OF AUTHORITIES

**CASES**

*Alonzo v. Maximus, Inc.*, 832 F. Supp. 2d 1122 (C.D. Cal. 2011)................................................. 16

*Altier v. Worley Catastrophe Response, LLC*, 2011 WL 3205229  (E.D. La. 2011) ......................... 20

*Bondi v. New Rochelle Hotel Assocs.*, No. 17 Civ. 5681, 2018 WL 7246962
    (S.D.N.Y. Dec. 7, 2018) ......................................................................................................... 19

*Boone v. PrimeFlight Aviation Servs.*, Inc., No. 15-CV-6077, 2018 WL 1189338
    (E.D.N.Y. Feb. 20, 2018)........................................................................................................ 16

*Caridad v. Metro- North Commuter R.R.*, 191 F.3d 283 (2d Cir. 1999) ....................................... 12

*Complaint of Consol. Coal Co.,* 123 F.3d 126 (3rd Cir.1997) .................................................... 23

*Cornn v. UPS*, 2005 U.S. Dist. LEXIS 30419 (N.D. Cal. 2005)..................................................... 21

*DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 27 F. Supp. 3d 313
    (E.D.N.Y. 2014)..................................................................................................................... 14

*Diaz v. Electronics Boutique of Am., Inc.*, No. 04- CV-0840E (SR), 2005 WL
    2654270 (W.D.N.Y. Oct. 17, 2005) ...................................................................................... 13

*DiDonato v. GC Servs. Ltd. P'ship*, No. 20 Civ. 2154, 2021 WL 4219504
    (S.D.N.Y. Sept. 16, 2021)....................................................................................................... 19

*Dorman v. DHL Express (USA), Inc.*, 2010 WL 446071 (W.D. Wisc. 2010) ................................. 20

*Eduoard v. Nikodemo Operating  Corp.*, No.  18-CV-5554  (BMC),  2019  WL
    3557687  (E.D.N.Y.  Aug. 5,  2019) ..................................................................................... 13

*Eng– Hatcher v. Sprint Nextel Corp.*, 2009 WL 7311383 (S.D.N.Y. Nov.13,
    2009)..................................................................................................................................... 18

*Fernandez v. Wells Fargo Bank, N.A.*, No. 12-CV-7193, 2013 WL 4540521
    (S.D.N.Y. Aug. 28, 2013)....................................................................................................... 18

*Fillipo v. Anthem Companies*, Inc., No. 122CV00926JRSMPB, 2022 WL
    18024818  (S.D. Ind. Dec. 30, 2022)..................................................................................... 19

*Frye v. Baptist Mem. Hosp., Inc.*, 2012 U.S. App. LEXIS 17791 (6th Cir. Aug. 21,
    2012)..................................................................................................................................... 11

*Gen. Tel. Co. of the Southwest v. Falcon*, 457  U.S. 147 (1982)...................................................... 11

*Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147  (1982) ................................... 12

*Groussman v. Motorola, Inc*., 2011 WL 5554030  (N.D. Ill. Nov. 15, 2011) .................................... 14

*Harrison v. Sears, Roebuck & Co.,* 981 F.2d 25  (1st Cir.1992) .................................... 23

*Hawkins v. Securitas Sec. Servs. USA, Inc.*, 280 F.R.D. 388 (N.D. Ill. 2011).................................... 20

*Hill v. County of Montgomery*, 9:14-cv-00933-BKS-DJS, 2020 WL 819225
(S.D.N.Y. 2020) .................................... 23

*Hinterberger v. Cath. Health Sys.*, 299 F.R.D. 22 (W.D.N.Y. 2014)........................................... 18

*Houston v. Saint Luke's Health Sys., Inc.*, No. 4:17-CV-00266-BCW, 2022 WL
1299121 (W.D. Mo. Mar. 29, 2022) ................................... 16

*In re Joint E. Dist. & S. Dist. Asbestos Litig.*, 995 F.2d 343 (2d Cir. 1993) ................................ 24

*In re Rodriguez*, 695 F.3d 360 (5th Cir. 2012) ................................... 19

*In  re Sinus Buster Products Consumer Litig.*, No. 12–CV–2429 (ADS), 2014 WL
5819921 (E.D.N.Y. Nov. 10, 2014).................................... 13

*In re: Joint E. Dist. and So. Dist. Asbestos Litig.*, 995 F.2d 343 (2d Cir. 1993) ......................... 23

*Ledbetter v. Pruitt Corp.*, No. 5:05-CV-329, 2007 WL 496451 (M.D. Ga. Feb. 12,
2007) .................................... 14

*Marshall v. Novant Health, Inc.*, No. 3:18cv633, 2020 WL 5577888 (W.D.N.C. Sept.
17, 2020).................................... 14

*Mendez v. H.J. Heinz Co*., No. CV 12-5652-GHK, 2012 WL 12888526 (C.D. Cal.
Nov. 13, 2012) .................................... 16

*Moore v. PaineWebber, Inc.*, 306 F.3d 1247 (2d Cir. 2002)........................................... 19

*Myers v. Hertz Corp.*, 624 F.3d 537 (2d Cir. 2010)........................................ 11

*Pecere v. Empire Blue Cross & Blue Shield*, 194 F.R.D. 66 (E.D.N.Y. 2000) .......................... 12

*Perez v. Allstate Ins. Co.*, No. 11–CV–1812 (JFB), 2014  WL
4635745(E.D.N.Y. Sept. 16, 2014).................................... 13

*Sampson v. MediSys Health Network, Inc.*, 2012 WL 3027850 (E.D.N.Y. Feb. 9,
2012).................................... 11

*SEC v. Geon Indus., Inc.*, 531 F.2d 39 (2d Cir. 1976) .................................... 23

*See Corbin v. Time Warner Entm't-Advance Newhouse P'ship*, 821 F.3d 1069 (9th Cir. 2015) ................................................................................................ 15

*Spagnola v. The Chubb Corp.*, 264 F.R.D. 76 (S.D.N.Y. 2010) ................................... 12

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ............................................... 1

*White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869 (6th Cir. 2012) ........................ 14

*White v. Washington Gas*, 2005 U.S. Dist. LEXIS 3461 (D. Md. 2005) ........................... 15

*Willoughby v. Youth Villages, Inc.*, 113 F. Supp. 3d 1265 (N.D. Ga. 2015) ..................... 14

*Wood v. Mid- America Mgmt. Corp.*, 192 Fed. Appx. 378  (6th Cir. 2006) ..................... 14

**RULES**

Fed. R. Evid. 407 ......................................................................................................... 23

FRCP 23 ........................................................................................................................ 12

**TREATISES**

5 James Wm. Moore et al., Moore's Federal Practice, § 23.46[2][e][i] (3ed. 2012) ........... 20

**REGULATIONS**

29 C.F.R. § 785.48 ....................................................................................................... 15

## PRELIMINARY STATEMENT

Defendant AHRC Health Care, Inc. ("Defendant" or "AHRC") submits this memorandum of law in opposition to Plaintiff's ("Plaintiff" or "Onate") motion class certification under F.R.Civ.P. 23 and in support of its cross-motion to strike improperly offered evidence of "subsequent remedial measures" under F.R.E. 407.

As the U.S. Supreme Court said in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), "[w]hat matters to class certification is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." (Emphasis in original). Further, the Court said, "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Class actions are procedural devices intended to allow courts to achieve judicial economy by adjudicating, on behalf of many, the same issue. If, despite the similarity of issues among putative class members, the evidence bearing on the issues will not result in a uniform answer, class actions cannot achieve judicial economy without abridging or modifying the rights of the parties. *Id.* at 2560.

Plaintiff has utterly failed to demonstrate that the proposed class—consisting of over 4,500 current and former nonexempt employees working in 8 different departments across 334 separate facilities, and holding over 180 unique job titles—meet the elements of commonality and typicality as a matter of law or that common questions predominate. To the contrary, Onate and his various declarants all assert different kinds of claims, depending upon what their title was, where they worked, and who their individual supervisor was. Onate, for one, complains that he was paid only a straight salary at all times. In other words, he is not claiming his pay was affected by any pay rules,

such as punch rounding or auto-meal break deductions.  Other hourly workers claim their hours were under-counted because they worked "off-the-clock," that is before they punched in and after they punched out.  Of those, some hourly workers allege they were instructed by their individual supervisors to do so.  Others do not make that allegation.   In fact, by creating two competing class definitions, one of which Onate falls within and one that he does not satisfy, Onate acknowledges that his efforts to stitch a class covering all of AHRC's operations was an overreach.

As is reflected below, there are myriad factors that may affect the compensation of AHRC's non-exempt employees, depending upon their position, their department and their work location.  But the claim Onate is making is not one that applies to the exceedingly broad group of workers he is trying to represent.  And conversely, he does not possess the claims he seeks to assert on behalf of the so-called "hourly subclass."

As explained further herein, the Court should therefore deny Plaintiff's motion in its entirety.

## STATEMENT OF FACTS

### I.    About AHRC NYC

AHRC is a 501(c)(3) not-for-profit organization operating in the five boroughs of New York City.  *Exhibit B*, ¶ 2.  AHRC Health Care, Inc. is a corporate entity that previously operated AHRC's Article 28 clinic.  *Exhibit B*, ¶ 2.

AHRC began in the summer of 1948 when Ann Greenberg (the mother of a four-year-old boy with developmental delays named Jerry, and AHRC's eventual Founder) placed a classified ad in the New York Post, in search of other mothers who shared her desire to create a school for

children with disabilities. ***Exhibit B, ¶ 3.*** Within a year, hundreds of parents responded and together created what became AHRC. ***Exhibit B, ¶3.***

For over 70 years, AHRC has provided programs, services, and supports for people with intellectual and developmental disabilities, and their families. ***Exhibit B, ¶ 4.*** Today, the agency serves more than 15,000 people each year. ***Exhibit B, ¶ 4.*** AHRC's mission is to empower people with intellectual and development disabilities to make choices and decisions based upon their own aspirations, live as independently and be as productive as possible, and participate fully in their communities. ***Exhibit B, ¶ 4.*** AHRC's programs are supported almost entirely through public funding, as over 90 percent of its revenue is derived from governmental contracts—that is, Medicaid reimbursements administered through New York State. ***Exhibit B, ¶ 4.***

## II.   AHRC's Broad Organizational Structure

AHRC employs over 4,000 people across its multiple departments.  AHRC is broadly organized into eight departments: Educational Services, Adult Day Services, Camping and Recreational Services, Employment and Business Services, Residential Services, In-Home Services, Family and Clinical Services, and Administration. ***Exhibit B, ¶6.***

AHRC employs 589 people in Adult Day Services covering 40 different programs, across 20 different locations. ***Exhibit B, ¶ 7.***  Of those individuals, 489 are hourly, non-exempt employees, whose pay varies weekly depending upon their hours worked.  *Id.* Of those 489 non-exempt employees, 284 of them are represented by a union, such that the terms and conditions of their employment are subject to collective bargaining negotiations.  *Id.*  General hours of operation for the agency's day habilitation programs span 8:30am – 4:30pm, Mondays through Fridays, with additional shift times that may depend upon hours requested by foster families

receiving services.  *Id.* Based on coverage needs for people supported by the program, employees have a variety of options related to the scheduling of lunch breaks that must be taken into account in determining work schedules and in calculating pay.  *Id.* There are also specialized float holiday rules for employees in this department, as well specific additional pay rules related to collective bargaining negotiations.  *Id.*

AHRC employs 371 people in Educational Services covering 8 programs, across eight different locations.  ***Exhibit B*, ¶ 8.**  Of these, 223 are non-exempt workers paid an hourly wage, not a straight salary.  *Id.* 54 of these hourly workers are also union employees subject to collective bargaining negotiations.  *Id.*   Staffing is comprised of senior officers, principals, coordinators, teaching staff, 1:1 aides, clinicians, and administrative staff, representing a combination of union and non-union staff; exempt, exempt OT eligible, and non-exempt staff; and regular and per diem job positions. *Id.* General hours of operation for the agency's schools span 7:30am – 4:30pm, Mondays through Fridays.  Outside of these general hours are janitorial shifts in each of the schools, which span 7:30am – 10:00pm.  *Id.*

AHRC employs 108 people in Camping and Recreational Services, covering 26 programs, across seven locations, of which 97 are non-exempt and paid by the hour. ***Exhibit B*, ¶ 9.**  Hours of operation for the social service agency's recreation programs vary, as follows: afterschool programs are generally 3:00pm–6:00pm, Mondays through Fridays; weekend recreation programs are generally 8:00am–4:00pm on Saturdays; weekend respite programs generally start on Friday nights and continue straight to Sunday afternoons; and camping programs are seasonal, and run from June to September each year for each 2-week camping session.  *Id.*  For camping programs, there are also temporary seasonal managerial, direct care, clinical, recreational and maintenance staff, including staff hired from foreign countries. *Id.*

Seasonal camp staff operate under specific pay rules related to being on a 24/7 schedule. All staffing in this department is non-union, but is also represented by a combination of exempt, exempt OT eligible, and non-exempt staff, as well as regular, per diem, and seasonal job positions. *Id.*

AHRC employs 975 people in Employment and Business Services, covering 95 programs, across 12 administrative locations and almost 200 different job sites. ***Exhibit B*, ¶ 10.** Of these, 912 are hourly, non-exempt employees, of which about 700 are comprised of people with intellectual or developmental disabilities who have been placed at private or government sector job sites, working under the auspices of supported employment programs administered by the agency, and another 59 are represented by a union. *Id.* Outside of the 700 or so people supported, staffing is comprised of senior officers, program directors, account executives, line supervisors, direct care professionals, administrative staff, all of whom support people with disabilities to either be trained for work, be placed in work sites, or be provided direct support at work sites. *Id.* Hours of operation vary significantly for the social service agency's employment & business services programs, as follows: job training programs for people supported generally span 8:30am –5:30pm, job coaching assignments for people supported at job sites are based on each person's work shift, and supervised support on New York City contracts is based on NYC work scheduling. *Id.* Further, each different NYC contract under which people supported are hired has its own prevailing wage calculations and pay requirements. *Id.*

AHRC employs 769 people in In-Home Services, 746 of which are paid by the hour and classified as non-exempt. ***Exhibit B*, ¶ 11.** Hours of operation vary significantly for Homecare Department employees, as it is wholly specific to the hours requested by programs which are

providing services or people who are receiving services.  *Id.* There are specialized travel pay rules for staff in this department.  *Id.*

AHRC employs 109 people in Family and Clinical Services, covering 25 programs across ten locations.  ***Exhibit B,*** ¶ **12.** 22 of these employees are hourly, non-exempt employees. General hours of operation for the Article 16 clinic span 7:30am – 7:30pm, Mondays through Fridays.  Non-clinical programs situated in the Family & Clinical Services Department have general hours of operation spanning from 8:30am – 5:30pm.  *Id.*

AHRC employs 765 people in Residential Services across 75 locations, 520 of which are non-exempt.  ***Exhibit B,*** ¶ **13.** Residential programs are all 24/7 operations. *Id.*  Staffing is comprised of senior officers, coordinators, house supervisors, direct care professionals, clinicians, and administrative staff.  *Id.* There are specialized Holiday Pay rules for staff in this department.

AHRC employs 194 people in Administration, of which 86 of these workers are hourly, non-exempt.  ***Exhibit B,*** ¶ **14.**  Nearly all employees in Administration work at AHRC's Headquarters on Maiden Lane in Manhattan.  *Id.*

## III.   Onate's Specific Claims in this Action

Onate was hired in January 2014 as a Medicaid Service Coordinator (MSC).  ***Exhibit B,*** ¶ **15.**  Medicaid service coordination involves assisting individuals with disabilities, who are Medicaid eligible, to obtain the services and supports they require based upon their assessed needs.  A true copy of Onate's job description is attached as ***Exhibit C.***

Onate's employment with AHRC ended in July 2018.  ***Exhibit B,*** ¶ **16.**  At that time, AHRC permanently ceased to provide Medicaid service coordination as a service and laid off all Medicaid Service Coordinators, including Onate.

At the time he was hired, Onate was classified as exempt from overtime requirements.

**Exhibit B, ¶ 17.**  A true copy of Onate's Notice of Pay Rate is attached as **Exhibit D.**  Onate

received subsequent a pay rate notice reaffirming his classification as overtime exempt.  A true

copy of Onate's subsequent Notice of Pay Rate is attached as **Exhibit E.**

In or around 2016, AHRC examined its exempt/non-exempt classification of certain job

titles.  **Exhibit B, ¶ 18.**  Medicaid Service Coordinator was identified as a job classification that

would be reclassified as "exempt, overtime eligible," by which it was intended that the MSC's

would continue to receive a salary and would be eligible to receive additional pay if they worked

more than 40 hours in a week.  *Id.*  AHRC decided that this change would be necessary to

comply with the new statutory salary requirements for maintaining exempt status. *Id.*

The decision to reclassify may not have been implemented as to Onate.  **Exhibit B, ¶ 19.**

Onate was never issued a pay rate notice informing him that he would become overtime eligible.

And Onate's earnings statements reflect that he never received overtime pay at any point during

his time with AHRC.  *Id.*

A true copy of Onate's earnings statements for the period January 2014 through July

2018 are attached as **Exhibit F.**  These statements reflect that Onate was paid a salary that

remained consistent week over week without reference to the number of hours he may have

worked in any of those weeks. *Id.*  Onate did not receive overtime pay during any pay period

wherein he worked for AHRC.  *Id.*

Onate himself has confirmed these details regarding his pay.  At deposition, Onate

consistently claimed that he was paid a flat salary, regardless of actual hours worked—not that

his time was adjusted around start or stop times or schedule breaks:

Q. You said that in the beginning, your salary stayed the same, your paycheck stayed the same week over week, no matter how many hours you worked; right?

A. Yes.

Q. My question is, were you ever informed by AHRC that there would be a change in the way that you were paid to where if you worked more than 40 hours, you would be available for additional pay beyond your base salary?
 ***

A. I told you sir, I can't recall.

*Exhibit G*, pp. 42-43.

Q. So what is the purpose of the case, in your understanding of it?

 A. The purpose of the case is to claim for overtime, because it is not reflected in my pay slip. And you are always repeating this pay slip. This is not the issue, sir, the issue is overtime, where is the overtime that you are trying to question, can you provide us the document? That's what I am looking for, and you should look for that. Because this is not reflective, as you know it, it is a plateau, it is always 70, 70, 70, all the way.

***

Q. Do you recall ever receiving a payment made to AHRC that was held out to be for overtime hours worked?

***

A. No, not a single, that's precisely why I filed the case.

Q. You were always paid just the regular salary that you were promised at the beginning?

A. Plateau, yes, yes.

*Exhibit G*, pp. 102-103.

**IV.    Differing claims of other putative class members**

Like Onate, all employees categorized by AHRC as "salaried overtime eligible," were paid on a salary basis, meaning that their weekly pay was made in a pre-determined fixed amount, without regard to their actual hours of work. ***Ex. H.***, p. 27, 87-88.  In contrast, hourly employees were paid varying amounts week over week depending upon their hours of work. ***Ex. I***, p. 39.  Certain hourly employees were subject to an automatic deduction for their scheduled meal breaks and were also subject to punch-rounding on a 15-minute interval.  Many hourly employees were not subject to those practices, for example, AHRC's union employees are not subject to automatic meal break deductions, ***Ex. H., p. 66-67,*** and its Home Care employees are not subject to the rounding rules because they use a completely different timekeeping system, i.e., time sheets signed by the client. ***Saffold Dep Tr.*** p. 63-64.  Onate's declarants from the putative class assert various claims that are not similar to Onate's claim.  Unlike Onate, most of his declarants are hourly workers.  And they all have differing claims based upon their particular experiences in their specific workplaces.  For example, some of Onate's declarants claim they work hours off the clock and that no one specifically directed them to do so. ***Ex. O***, p. 31-32.  Some claim they worked off the clock from time to time, but not at the direction of a supervisor. ***See Ex. W***, p. 37-38.  Some claim they were specifically directed by their supervisors to off the clock. **See Ex. KK**, 65.  Some do not claim at all that they worked off the clock. ***See Ex. W,*** p. 36.  Some acknowledge they were not subject to a meal break deduction. ***See Ex. Z***, p. 34.

**V.**   **Processes for ensuring accurate count of hours worked**

AHRC pays its hourly workers for time worked beyond their scheduled hours even in cases where prior approval is not sought, though hourly employees are advised to seek prior approval from their individual supervisors before working any hours beyond their standard shift. ***Fong Dep, Tr.***, p. 104-107.  AHRC does not oversee this approval process in any centralized

way, rather, it is the responsibility of each individual supervisors to instruct their staff to report

any working time that may not have been recorded in the time keeping system. *Ex. H.,* p. 58-59.

When an hourly employee worked beyond their scheduled hours, it was the responsibility of

their individual supervisor to correct the punches. ***Fong Dep, Tr.***, p. 61-62, 99.

## VI.   Relevant Procedural History

Through the course of the litigation, three have been various rulings that address the

scope of Onate's putative class definition—mainly focused on identifying the pay practices that

Plaintiff is challenging.  A recurring issue centered on whether Onate actually has a rounding

claim or a meal break claim when he was compensated on a salary basis.  (See Dkt. 51.)

Pursuant to discovery Orders dated June 14, 2021 and April 22, 2022, AHRC produced time and

pay records for approximately 800 employees who, like Onate, were classified as "salaried

overtime eligible" by AHRC.

Then in two subsequent orders, dated May 26, 2022 and February 9, 2023, the Court

found that Onate's alleges he was compensated based upon his scheduled hours and that this

allegation was sufficient to compel discovery as to hourly paid employees (see Dkt. No. 102) and

to authorize notice of the lawsuit to hourly paid workers under Sec. 216 of the FLSA.  (see Dkt

No. 146).  Notices were sent to approximately 4500 current and former employees.

Now Onate brings a motion under Rule 23 for class certification of all 4500-plus

employees who received FLSA court-authorized notice.  In so doing, Plaintiff offers two

competing class definitions, which he characterizes as "subclasses":

> Class of Hourly Employees: All current and former non-exempt hourly employees
> of AHRC (the ("Hourly Employees") in the State of New York at any time from
> the six years prior to the filing of the Complaint to the entry of judgment in this

10

case excluding employees in the Home Health Department (the "Hourly Employees Class").

Class of Salaried Employees: All current and former salaried and overtime eligible employees of ARHC (the "Salaried Employees") in the State of New York at any time from the six years prior to the filing of the Complaint to the entry of judgment in this case excluding employees in the Home Health Department (the "Salaried Employees Class").

*     *     *

On these facts, the Court should deny Plaintiff's motion in its entirety.

<b>ARGUMENT</b>

## I.      Legal Standard Under Rule 23

Parties requesting class certification must justify the application of a litigation device that is "an exception to the usual rule." *Dukes*, 131 S. Ct. at 2550; *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 155 (1982) ("The class-action device was designed as an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only") (internal quotations omitted). The requirements for Rule 23 class certification are much more stringent than the "modest factual showing" required under the standard for conditional certification and more stringent than the standard applied for final certification of FLSA collective actions. *Frye v. Baptist Mem. Hosp., Inc.*, 2012 U.S. App. LEXIS 17791, *8 (6th Cir. Aug. 21, 2012).

Parties seeking class certification must establish, *inter alia*, four factors: (1) the class is too numerous for joinder of all members ("Numerosity"); (2) issues of law or fact are common to the class ("Commonality"); (3) Plaintiff's claims are typical of the class ("Typicality"); and (4) Plaintiff will adequately protect the interests of the class ("Adequacy"). Fed. R. Civ. P. 23(a); *accord Sampson v. MediSys Health Network, Inc.*, 2012 WL 3027850, *1 (E.D.N.Y. Feb. 9, 2012); *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010); *Callari v. Blackman*

11

*Plumbing Supply, Inc.*, 307 F.R.D. 67, 74 (E.D.N.Y. 2015). In addition, a plaintiff also must satisfy the prerequisites of FRCP 23(b) by proving that questions of law/fact common to class members predominate over individualized inquiries, and/or that final injunctive or declaratory relief is appropriate for **all** class-members as a whole. Fed. R. Civ. P. 23(b)(2), (3); *Caridad v. Metro- North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir. 1999).

Plaintiff must satisfy all prerequisites of FRCP 23 by a preponderance of the evidence. *Jackson v. Bloomberg*, 298 F.R.D. 152, 159 (S.D.N.Y. 2014). "[A] failure to meet any one of [FRCP] 23's requirements destroys the alleged class action." *Pecere v. Empire Blue Cross & Blue Shield*, 194 F.R.D. 66, 69-70 (E.D.N.Y. 2000); *see also Spagnola v. The Chubb Corp.*, 264 F.R.D. 76, 92 (S.D.N.Y. 2010). Class Certification is "an exception to the usual rule" and must be adjudicated stringently. *Dukes*, 131 S. Ct. at 2550; *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 155 (1982) ("The class-action device was designed as an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."). Further, "the requirements for certifying a class under [FRCP] 23 are … more stringent than the requirements for 'similarly situated' employees to proceed in a collective action under § 216(b)." *Scott*, 954 F.3d at 512. Since Plaintiffs cannot demonstrate compliance with FRCP 23 (both sections (a) and (b)), Plaintiffs' Motion for class certification should be denied.

## II.    Plaintiff Cannot Satisfy the Requirements of Rule 23(a)

Even if Plaintiffs were able to establish Numerosity under FRCP 23(a) (a contention Defendant does not concede), all record evidence reveals they have not and cannot establish Adequacy, Commonality and Typicality. In this regard, the Supreme Court holds:

> [t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); s*ee also Eduoard v. Nikodemo Operating Corp.*, No. 18-CV-5554 (BMC), 2019 WL 3557687 (E.D.N.Y. Aug. 5, 2019)(denying class certification for lack of Commonality and Typicality).

The Supreme Court also warns FRCP 23(a)'s Commonality "language is easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.'" *Dukes*, 564 U.S. at 349. But that is not enough. Instead,

> Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury. This does not mean merely that they have all suffered a violation of the same provision of law…Their claims must depend upon a common contention…That common contention, moreover, must be of such a nature that it is capable of class-wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

*Id.* In order to satisfy Typicality, plaintiffs must show that the "claims of the class representatives… arise from the same course of events, and [that] each class member makes similar legal arguments to prove the defendant's liability." *Diaz v. Electronics Boutique of Am., Inc.*, No. 04- CV-0840E (SR), 2005 WL 2654270, *7 (W.D.N.Y. Oct. 17, 2005); *Perez v. Allstate Ins. Co.*, No. 11–CV–1812 (JFB), 2014 WL 4635745, at *24 (E.D.N.Y. Sept. 16, 2014) (same); *In re Sinus Buster Products Consumer Litig.*, No. 12–CV–2429 (ADS), 2014 WL 5819921, *4 (E.D.N.Y. Nov. 10, 2014).

Satisfying the commonality requirement requires plaintiffs to do much more than "simply point to some questions of fact or law relevant to potential class members." *Groussman v. Motorola, Inc.*, 2011 WL 5554030, at *3 (N.D. Ill. Nov. 15, 2011).   Plaintiffs must show that "class members 'have suffered the same injury,' [which] does not mean merely that they have all suffered a violation of the same provision of law." *Id.*; see also *Dukes*, 131 S. Ct. at 2551.  Where individualized analyses are required for each class member, the commonality requirement cannot be satisfied.  See *Id.* at *4 (finding that plaintiffs failed to satisfy the commonality requirement when "the assessment of damages for each Plaintiff and proposed class member" would "become a massive series of individualized analyses" despite the fact that there "may be some general overlapping common issues of fact and law").

For the following reasons, Onate has failed to meet this burden.

## A.    Existence of the meal break pay rules is not enough

It is well established that an automatic deduction for a meal break is not a per se violation of the FLSA. *See DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 27 F. Supp. 3d 313, 320-21 (E.D.N.Y. 2014); *Marshall v. Novant Health, Inc.*, No. 3:18cv633, 2020 WL 5577888, at *7 (W.D.N.C. Sept. 17, 2020). *Ledbetter v. Pruitt Corp.*, No. 5:05-CV-329, 2007 WL 496451, at *4 (M.D. Ga. Feb. 12, 2007) ("[a] policy of automatic meal deductions does not per se violate the FLSA.")(citation omitted); *see also White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 873 (6th Cir. 2012) ("An automatic meal deduction system is lawful under the FLSA."). Such a policy violates the FLSA's overtime provisions only if (1) its employees worked overtime hours during these lunch breaks without compensation and (2) the employer knew or should have known of the uncompensated overtime work. *Willoughby v. Youth Villages, Inc.*, 113 F. Supp. 3d 1265, 1273-74 (N.D. Ga. 2015); *Wood v. Mid- America Mgmt. Corp.*, 192 Fed. Appx. 378, 381 (6th Cir. 2006);

14

*White v. Washington Gas*, 2005 U.S. Dist. LEXIS 3461 *13-14 (D. Md. 2005) (dismissing plaintiff's claims for time worked during unpaid meal breaks where employee "never reported those hours on his timesheets, nor did he ever asked to be paid for those hours until this lawsuit").

Onate does not have a meal break claim as he complains only that he was paid on a straight salary basis, such that his pay did not vary whether he worked through lunch or not. Further, the mere existence of the meal break rule could not support class certification because the pay rule alone is insufficient to establish a violation of law.  AHRC's organization goal is to ensure that all hours worked are paid.  Employees are instructed to report their time if they work through a meal break.  In each case, it is the worker's individual supervisor that was responsible for adjusting employee time.  Therefore, for any putative class member making a meal break claim, their claim would necessarily require proof as to whether their individual supervisor knew of should have known of the additional time.

**B.      Existence of the rounding pay rules not enough**

The U.S. Department of Labor adopted a regulation that generally allows rounding practices. 29 C.F.R. § 785.48(b) permits employers to round time to the nearest quarter of an hour, provided that the arrangement averages out so that the employees are fully compensated for the time they actually work. The regulation provides that such a rounding practice will be accepted, "provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked." Id. District courts regularly uphold the validity of employers' neutral rounding practices. *See Corbin v. Time Warner Entm't-Advance Newhouse P'ship*, 821 F.3d 1069, 1076 (9th Cir. 2015) (collecting cases).

15

"Rounding policies may be permissible if they, 'on average, favor neither overpayment nor underpayment.' " *Mendez v. H.J. Heinz Co*., No. CV 12-5652-GHK, 2012 WL 12888526 (C.D. Cal. Nov. 13, 2012) (*quoting Alonzo v. Maximus, Inc.*, 832 F. Supp. 2d 1122, 1126 (C.D. Cal. 2011) ). "If an employer's rounding practice does not permit both upward and downward rounding, then the system is not neutral and 'will ... result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.' " *Corbin* at 1077 (quoting 29 C.F.R. § 785.48(b) ).. Where the employer's rounding policy "is neutral on its face, an FLSA violation arises only if the rounding policy as applied, 'over a period of time' systematically undercompensates Defendants' employees." *Houston v. Saint Luke's Health Sys., Inc.*, No. 4:17-CV-00266-BCW, 2022 WL 1299121, at *7 (W.D. Mo. Mar. 29, 2022)(summary judgment dismissing rounding claim; net effect 74,282.37 hours of uncompensated time insufficient to show "systematic" underpayments); *Boone v. PrimeFlight Aviation Servs.*, Inc., No. 15-CV-6077, 2018 WL 1189338, at *7 (E.D.N.Y. Feb. 20, 2018) (collecting cases).

Additionally, in *Corbin* and *Boone*, the courts noted that federal regulations do not require that rounding policies result in every employee gaining or breaking even in every pay period. *See Corbin*, 821 F.3d at 1077; *Boone*, 20185 WL 1189338, at *9. "If the rounding policy was meant to be applied to each employee to ensure that no employee ever lost a single cent over a pay period, the regulation would have said as much." *Corbin*, 821 F.3d at 1077. "Employers use rounding policies to calculate wages efficiently; sometimes, in any given pay period, employees come out ahead and sometimes they come out behind, but the policy is meant to average out in the long-term." Id. (emphasis in original).

Similar to the meal break issue, the mere existence of the rounding rules cannot support class certification. Onate, for one, does not assert that claim. And even as to the hourly workers

he seeks to include in this case, The pay rules facially comply with applicable regulations in that they allow for both upward and downward rounding on a fifteen minute interval.  Onate offers only anecdotal instances where the rounding rule result in a net negative to the worker in isolated work weeks, and not proof of the kind of systematic underpayments that would support class certification of such a claim.

## C.     There is no centralized policy to deny payment for hours worked

Because the rounding and meal break pay rules are facially neutral, Onate is necessarily challenging the application of those policies (not for himself though, as his records show he was not subjected to these policies).  Here, the record shows that AHRC's organizational goal is to ensure that all employees are paid for all hours worked.  To that end, managers and supervisors are afforded discretion to vary the schedules of the staff dependent upon the needs of their respective departments, and to approve any necessary adjustments in timekeeping system to ensure staff are paid for such variations.  If any putative class member is claiming their were underpaid for hours worked beyond the normal, then the failure was the result of either: (1) the individual worker's failure to report the extra work or (2) the individual supervisor's failure to approve the adjustment.

Where individual supervisors are given discretion over employment decisions, like the scheduling and adjustment of working hours, it shows nothing more than "a policy against having uniform employment practices" and is "just the opposite of a uniform employment practice that would provide commonality needed for a class action." *Dukes*, 131 S. Ct. 2541, 2554.  On this record, Onate has failed to establish a common directive behind the separate, independent decisions of defendants' individual supervisors, the putative class here lacks the necessary glue" to hold its claims together. *Id.* at 2545. Without that glue, the *Dukes* court made clear, "it will be impossible to say that examination

of all the class members' claims for relief will produce a common answer . . . ." *Dukes* 131 S. Ct. at 2552 (emphasis in original).

Plaintiffs challenge the implementation of facially lawful policies. Given there is no "common policy" violative of the law applicable to all class members, Plaintiffs have failed to establish Commonality under FRCP 23(a). *See, e.g.*, *Fernandez v. Wells Fargo Bank, N.A.*, No. 12-CV-7193, 2013 WL 4540521, *5 (S.D.N.Y. Aug. 28, 2013) (denying certification for pre/post shift and meal break ("off the clock") hours, as Wells Fargo had no actual policy violative of the law, and establishment of a *de facto* policy commonly applicable to all employees could not be established on a class-wide basis); *Eng– Hatcher v. Sprint Nextel Corp.*, 2009 WL 7311383, at *3 (S.D.N.Y. Nov.13, 2009) (denying FLSA and Rule 23 certification); *Hinterberger v. Cath. Health Sys.*, 299 F.R.D. 22, 55 (W.D.N.Y. 2014) (denying class certification because plaintiffs failed to adduce evidence of a "system-wide" policy that resulted in employees working through meal breaks). Thus class certification should be denied.

## III.   Plaintiff Cannot Satisfy the Requirements Rule 23(b)

Onate has failed to satisfy Rule 23(a) and his motion should be denied on that basis alone.  As separate, independent basis for denying the motion, Onate cannot satisfy Rule 23(b).

A class action may only be maintained under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).  The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" and assesses whether a "class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated . . . ." *Amchem Prods., Inc.*, 521 U.S. at 615,

18

623 (quotation omitted); *see also Myers*, 624 F.3d at 547.  General questions predominate "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

## A.    Plaintiff's fail-safe class definition is unworkable

A fail-safe class requires a court to decide the merits of individual class members' claims to determine class membership.  *In re Rodriguez*, 695 F.3d 360, 369-70 (5th Cir. 2012) ("A fail-safe class is a class whose membership can only be ascertained by a determination of the merits of the case because the class is defined in terms of the ultimate question of liability.").  Courts in this circuit typically refuse to certify fail-safe classes unless the fail-safe aspect can be overcome by redefining the class or some other means. *See, e.g., DiDonato v. GC Servs. Ltd. P'ship*, No. 20 Civ. 2154, 2021 WL 4219504, at *8 (S.D.N.Y. Sept. 16, 2021); *Bondi v. New Rochelle Hotel Assocs.*, No. 17 Civ. 5681, 2018 WL 7246962, at *14 (S.D.N.Y. Dec. 7, 2018), R. & R. adopted, No. 17 Civ. 5681, 2019 WL 464821 (S.D.N.Y. Feb. 6, 2019).

A class definition that is limited by "exempt" or "non-exempt" status under the FLSA/NYLL is a textbook example of an improper fail-safe. *Fillipo v. Anthem Companies*, Inc., No. 122CV00926JRSMPB, 2022 WL 18024818, at *2 (S.D. Ind. Dec. 30, 2022) ("Plaintiffs cannot of course straight out define the collective as those misclassified by Defendant as exempt outside salespersons because that would create an impermissible fail-safe class").

Onate's reference to exempt/non-exempt status in the class definition is improper because it requires the Court to decide each putative class members' class status to determine whether they are appropriately included in the class.  The issue is particularly burdensome in this action

because, like Onate, nearly 800 of the putative class members were treated as exempt for part of

all of the putative class period.  The practical effect of this improper definition is that the putative

class gets a free pass.  In other words, any putative class member await the outcome of this

action and (1) reap the benefit of a favorable outcome or (2) dispute the adverse impact of an

unfavorable outcome by claiming they were never included in the class definition.

**B.**   **Onate's sweeping class definition necessarily means that individualized questions will predominate over any common questions**

The predominance requirement is "far more demanding" than the commonality requirement

under Rule 23(a). *Amchem*, 521 U.S. at 623-24; *Dorman v. DHL Express (USA), Inc.*, 2010 WL

446071, at *3 (W.D. Wisc. 2010).  Importantly, merely seeking the same relief is not sufficient to

establish predominance, particularly when there are significant individualized damages or evidentiary

issues.  See *Altier v. Worley Catastrophe Response, LLC*, 2011 WL 3205229, at *16 (E.D. La. 2011)

(finding that plaintiffs failed to show that common issues predominated over individualized issues

when damages calculations and individual circumstances would need to be analyzed for each putative

class member); 5 James Wm. Moore et al., Moore's Federal Practice, § 23.46[2][e][i] (3ed. 2012) ("If

each class member's individual damages claim must be resolved, and if each damages calculation is

relatively complex, the class is probably unmanageable").

Although an employee's challenge of an employer's uniform policy may satisfy the

predominance requirement under certain circumstances, when manager-specific practices only apply

to certain individual employees, the individualized inquiry into the facts surrounding each proposed

class member precludes class certification. *Dorman*, 2010 WL 446071, at *3, *5. "Predominance is

not satisfied where liability determinations are individual and fact intensive." *Hawkins v. Securitas

Sec. Servs. USA, Inc.*, 280 F.R.D. 388, 396 (N.D. Ill. 2011).  Here, for all of the same reasons that

20

plaintiffs have failed to demonstrate commonality and typicality set forth in Point I above, plaintiffs

have likewise failed to meet the higher standard of predominance required by Rule 23(b)(3).  This is

particularly true with respect to the myriad defenses defendants intend to raise.  *Myers*, 624 F.3d at 551

(observing that it is "well established that courts must consider potential defenses in assessing the

predominance requirement").

In *Camilotes*, for example, the court found that the predominance requirement was not met

because "Plaintiffs will not be able to prove their claims using evidence that is common to the class –

rather, individualized inquiries into the facts surrounding each Plaintiffs meal period experiences will

be required."  2012 U.S. Dist. LEXIS 143583, at *49. *see also Cornn v. UPS*, 2005 U.S. Dist. LEXIS

30419, at *17-18 (N.D. Cal. 2005) (declining to certify a class in a suit involving allegations of

uncompensated pre-shift work "[b]ecause the Court cannot determine whether a driver performed

work during the interval in question without undertaking individualized inquiries that predominate

over any common questions" and aptly observing that "there is no common practice among package-

car drivers as to when they punch in to work. Some drivers may punch in immediately after arriving

at the building, while others may punch in just before their scheduled start times.  In addition, drivers

perform a variety of non-work-related tasks, such as socializing, reading the newspaper, and

drinking coffee or tea, after punching in but before their scheduled start times.  If a driver punched in

thirty minutes prior to his or her scheduled start time but actually did no work during that time, then

UPS's practice of calculating hours worked based on the scheduled start time would not be

unlawful." (citations omitted)).

Onate's claim presents a threshold question as to whether AHRC properly classified him

as an exempt employee lawfully paid on a salary basis.  This question, in turn, will involve an

analysis of his responsibilities, work duties, and the amount of time spent on each.  This

analysis is necessarily job specific and not applicable to any of the thousands of non-exempt

employees in different job titles that this motion seeks to cover.  Further, beyond the threshold

classification question, Onate testified clearly that he is not asserting the time clock-based

claims that are the foundation of this motion.  Onate simply claims he was paid a flat salary

week over week.  He does not claim his pay varied depending upon when he clocked in, when

he clocked out, whether he did or did not take breaks, etc.  This motion, on the other hand,

seems fixed on how hourly, non-exempt employees may have been paid.  Indeed, Onate's

declarants all make various kinds of hourly-based claims.  And as stated above, for each one of

them, liability will turn on whether their individual supervisor knew or should have known of

their additional working hours.  There is no common proof that will answer this question.  Thus

while, usage of the time clock may be a common question, it is not one that will predominate

over the many individual questions required to determine liability for each putative class

member.

*        *        *

For all of the foregoing reasons, the Court should deny Plaintiff's motion for class
certification.

## IV.   CROSS-MOTION TO STRIKE EVIDENCE OF SUBSEQUENT REMEDIAL MEASURES

Defendant cross-moves to strike and have the following exhibits be removed from the

docket and references to remedial measures thereto in Plaintiff's Memorandum be redacted and

otherwise disregarded: **(1)** Exhibit 41 – May 2014 Internal Email Chain Re: Discussion of

Remedial Measures for Meal Breaks; **(2)** Exhibit 42 – August 2016 Internal Email Chain Re:

Discussion of Remedial Measures for Meal Breaks; **(3)** Exhibit 43 – March 11, 2014 Department

of Labor Correspondence; **(4)** Exhibit 44 – March 2018 Internal Email Chain Re: Discussion of

22

Remedial Measure of New Payroll System; **(5)** Exhibit 45 – April 24, 2019 BKD, LLC ("BKD")

Engagement Letter; **(6)** Exhibit 46 – 2021 BKD Draft Audit Report; **(7)** Exhibit 48 – BKD

Preliminary Audit Findings; **(8)** Exhibit 49 – Email Chain RE: 2021 BKD Draft Audit Report;

and **(9)** All references to Exhibits 41-46 and 48-49 in Plaintiff's Memorandum, specifically on

pages 9-10 and 15.

      The foregoing documents contain various finding and recommendations made to AHRC

by their outside accountants, BKD, subsequent to the filing of a federal wage and hour lawsuit:

In or around October 2018, a putative class/collective action was commenced alleging wage-and-

hour violations within certain programs of AHRC NYC, *Villar v. AHRC Home Care Services,*

*Inc.*, 18-cv-9174(OTW). Onate offers these documents for the explicit purposes of trying to

persuade the Court that the putative class claims are meritorious and that class certification is

appropriate because AHRC sought professional guidance on best practices after a prior, similar

lawsuit was filed  This is a nakedly improper use of subsequent remedial measure evidence.

      Pursuant to Federal Rule of Evidence 407, evidence of remedial measures is not

admissible to prove negligence, culpable conduct, a defect in a product or its design, or a need

for a warning or instruction. Fed. R. Evid. 407; *SEC v. Geon Indus., Inc.*, 531 F.2d 39, 52 (2d

Cir. 1976) (upholding decision by trial court to exclude evidence that brokerage firm had

introduced a new regulation aimed at preventing future securities violations); *In re: Joint E. Dist.*

*and So. Dist. Asbestos Litig.*, 995 F.2d 343, 345-46 (2d Cir. 1993) (remanding for new trial after

district court erred in failing to exclude evidence of subsequent remedial measures.) *See Hill v.*

*County of Montgomery*, 9:14-cv-00933-BKS-DJS, 2020 WL 819225 (S.D.N.Y. 2020). Federal

Rule Evidence 407 provides that it "does not require the exclusion of evidence of subsequent

measures when offered for another purpose, such as ... impeachment or--if disputed--proving ownership, control, or the feasibility of precautionary measures." However, in order to prevent the exception from swallowing the rule, such "evidence offered for impeachment must contradict the witness's testimony directly." *Complaint of Consol. Coal Co.,* 123 F.3d 126, 136 (3rd Cir.1997); *see also Harrison v. Sears, Roebuck & Co.,* 981 F.2d 25, 31 (1st Cir.1992) (noting that impeachment exception generally requires a "nexus between the statement sought to be impeached and the remedial measure"). In addition, even if the evidence could arguably fit within the Rule 407 impeachment exception, a Court must also engage in normal Rule 403 balancing. *Id.* at 32.

In the Memorandum, the exhibits Plaintiff cite and make reference to are documents of Defendant's internal email discussions (Exhibits 41-44, 49) regarding potential corrective improvements to the time keeping system and Defendant's auditor, BKD's, recommendations (Exhibits 45-46, 49) for the time and pay systems. Plaintiff cites these exhibits in support of the argument for commonality and typicality, particularly to assert that AHRC allegedly has common unlawful policies and practices that effect all members of the purported class. (See Plaintiff's Memorandum, p. 9-10,13-19). Plaintiff uses these exhibits to take the argument one step further and assert that Defendant has never taken steps to revise the unlawful practices alleged. However, the exhibits Plaintiff's reference are the exact evidence of some of the measures Defendant has taken to upgrade its time keeping and payroll systems. Defendant has engaged its Human Resources Department employees to discuss potential steps to improve their systems, such as implementing a new time keeping software; and Defendant has engaged a third-party auditor, BKD, to conduct an audit of its time keeping and payroll system to identify potential issues and implement solutions. Using these references as evidence of culpability is

24

firmly against public policy to encourage companies to take corrective measures. *Cf.* Fed. R. Evid. 407 Advisory Comm. Notes.

Plaintiff cannot claim that this evidence falls within the impeachment exception under Rule 407 because Defendant has not contested "ownership, control, or the feasibility of precautionary measures," nor does Plaintiff allege that Defendant has contested such in the Memorandum. *See In re Joint E. Dist. & S. Dist. Asbestos Litig.*, 995 F.2d 343, 345-46 (2d Cir. 1993) ("a defendant must first contest the feasibility of a warning before the subsequent warning would become admissible." (citing Fed. R. Evid. 407 advisory committee's notes (1972 Proposed Rules) ("The requirement that the other purpose be controverted calls for automatic exclusion unless a genuine issue be present and allows the opposing party to lay the groundwork for exclusion by making an admission.")). Therefore, there is no permissible reason for evidence of Defendant's subsequent remedial measures to be admissible, and such evidence should be stricken from the docket.

## CONCLUSION

For all the foregoing reasons, the Court should deny Plaintiff's motion in its entirety, grant Defendants' their reasonable attorneys' fees and costs, and award such other and further relief as the Court deems proper and just.

Dated: September 12, 2023
       New York, New York

Respectfully submitted,
CLIFTON BUDD & DeMARIA, LLP
Attorneys for Defendant
AHRC Health Care, Inc.

25

By: _____

Arthur J. Robb
Melissa A. Romain
The Empire State Building
350 Fifth Avenue 61st Floor
New York, New York 10118
(212) 687-7410